UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

CARL A. HOLLAWAY,                       :

                      Plaintiff,        :    14 Civ. 5165 (RA)(HBP)

     -against-                          :    REPORT AND
                                             RECOMMENDATION
CAROLYN W. COLVIN, ACTING,              :
Commissioner of Social Security,
                                        :

                      Defendant.        :

----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE RONNIE ABRAMS, United States District
Judge,

I.   Introduction

          Plaintiff Carl A. Hollaway brings this action pursuant
to Section 205(g) of the Social Security Act (the "Act"), 42
U.S.C. § 405(g), seeking judicial review of a final decision of
the Commissioner of Social Security ("Commissioner") denying his
applications for disability insurance benefits ("DIB") and
supplemental security income ("SSI").  The Commissioner and
plaintiff have both moved for judgment on the pleadings pursuant
to Rule 12(c) of the Federal Rules of Civil Procedure.

For the reasons set forth below, I respectfully recommend that the Commissioner's motion (Docket Item ("D.I.") 19) be granted and the plaintiff's cross-motion (D.I. 22) be denied.

II.   <u>Facts</u>[1]

A.   <u>Procedural Background</u>

Plaintiff filed an application for SSI and DIB on January 19, 2011, alleging that he had been disabled since August 31, 2010 (Tr.[2] 148-65).  With the assistance of his attorney, plaintiff completed a written report in connection with his claim for benefits, which was submitted on February 15, 2011 (Tr. 169-82).  Plaintiff claimed he was disabled due to "spinal cord disease" (Tr. 170).  He reported that, among other things, he used the internet, prepared meals daily, did laundry, and swept and mopped floors (Tr. 175, 177).  Plaintiff also reported that he could shop for up to an hour at a time and could walk and use public transportation (Tr. 178).  Plaintiff reported that he avoided leaving his home and engaging with others due to the side effects from his medication (Tr. 175).  He reported that even

---

[1] I recite only those facts relevant to my review.  The administrative record that the Commissioner filed, pursuant to 42 U.S.C. § 405(g) (<u>see</u> SSA Administrative Record, dated August 23, 2014 (D.I. 10)) more fully sets out plaintiff's medical history.

[2] "Tr." refers to the administrative record (D.I. 10).

though all physical activity caused him pain, he could walk without limitation and without needing to stop and rest (Tr. 180).  Plaintiff reported that he had no hobbies or interests (Tr. 179).

On April 4, 2011, the Social Security Administration ("SSA") denied both of plaintiff's applications, finding that he was not disabled (Tr. 4-8, 13-25, 53-59, 62-76).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 77).  ALJ Curt Marceille conducted a hearing by video conference on September 24, 2012 (Tr. 29-51). The ALJ reviewed the claim de novo and, in a decision dated October 23, 2012, determined that plaintiff was not disabled within the meaning of the Act for the period from January 19, 2011 through the date of the decision (Tr. 13-25).  The ALJ's decision became the Commissioner's final decision on April 24, 2014 when the Appeals Council denied plaintiff's request for review (Tr. 4-8).  Plaintiff commenced this action on July 3, 2014 seeking review of the Commissioner's decision.

B.  Plaintiff's
    Social Background

Plaintiff was born on January 6, 1965 and was 46 years old at the time of his application (Tr. 148, 150).  Plaintiff

3

attended school through eleventh grade and subsequently earned a general education diploma (Tr. 41). Plaintiff reported that he had last worked in August 2010, parking and unloading cars (Tr. 171). During the two months that he worked in 2010, plaintiff earned $795 (Tr. 40, 171, 160). From 1983 through 1996, plaintiff had reported earnings in four separate years totaling $4,154.57 (Tr. 159-60). Plaintiff had no reported earnings from 1997 through 2009 because he was incarcerated during that time (Tr. 40, 45). Plaintiff reported that his parents are deceased, that he is single and that he has one son (Tr. 235). Plaintiff also reported that he lives with friends and that his aunt and cousin assist him at home (Tr. 39, 175)

        C. Plaintiff's
           Medical Background

        Although plaintiff alleged that he was disabled as of August 31, 2010, the period under review runs from the date of plaintiff's application on January 19, 2011 through the issuance of the Commissioner's final decision. See 20 C.F.R. § 416.330; 20 C.F.R. § 416.335. Nevertheless, consistent with 20 C.F.R. § 416.912(d), the ALJ considered plaintiff's complete medical history to determine whether plaintiff had been disabled within the meaning of the SSA since the date of his application on

4

January 19, 2011.  Plaintiff's counsel confirmed that the record
before the ALJ was complete and allowed for a full and fair
consideration of plaintiff's claim of disability (Tr. 16, 204,
206).

       1.  Visits to Beth Israel between
          January 4, 2011 and January 19, 2011

On January 4, 2011, plaintiff sought treatment at the
emergency room of Beth Israel Medical Center ("Beth Israel") for
complaints of back pain (Tr. 224).  The primary diagnosis was
"spinal cord disease" with an "additional" diagnosis of "cauda
equina syndrome" (Tr. 224).[3]  Plaintiff left the emergency room
against medical advice, and was advised to follow up in three
days with a neurosurgeon, Dr. Allen Maniker (Tr. 224, 227).

On January 5, plaintiff returned to Beth Israel for a
magnetic resonance image ("MRI") of his lumbar spine.  The MRI

---

[3] Cauda refers to a tail or taillike appendage and equina
refers to collection of spinal roots that descend from the lower
part of the spinal cord and are located within the lumbar cistern
of the caudal dural sac.  Dorland's Illustrated Medical Dictio-
nary ("Dorland's") 308 (32nd ed. 2012).  Cauda equina syndrome is
"a group of symptoms caused by compression of the spinal nerve
roots, including dull, aching pain of the perineum [(the region
occupying the pelvic outlet)], bladder, and sacrum [(the triangu-
lar bone just below the lumbar vertebrae)] that generally radi-
ates in a sciatic fashion and is associated with paresthesias
[(an abnormal touch sensation)] and areflexic [(absence of
reflexes)] paralysis."  Dorland's at 130, 1383, 1414, 1824.

revealed, at the T2 level,[4] a 1.4 x .9 x .9 cm rounded

intramedullary[5] lesion that likely corresponded to an epidermoid[6]

questionable bilateral spondylolysis[7] at the L5 level[8] and a very

mild concentric disc bulge at L4-L5, with minimal foraminal[9]

narrowing (Tr. 219-20).  The MRI report noted that "[t]hese

findings are concerning for an intramedullary neoplasm of glial

---

[4] The thoracic vertebrae, denoted by symbols T1 through T12, are usually twelve in number and are situated between the cervical and the lumbar vertebrae, giving attachment to the ribs and forming part of the posterior wall of the thorax.  Dorland's at 2051.

[5] Intramedullary means within the spinal cord.  Dorland's at 954.

[6] Epidermoid refers to an epidermoid cyst, which is "a benign tumor in the skull, meninges, or brain, formed by inclusion of epidermal elements, especially at the time of closure of the neural groove." Dorland's at 459, 631.

[7] Spondylolysis refers to dissolution of a vertebra. Dorland's at 1754.

[8] The lumbar vertebrae, denoted by symbols L1 through L5, are the five vertebrae below the thoracic vertebrae and above the sacrum.  Dorland's at 1662, 2051.

[9] "Foramen", whose plural is "foramina," means "a natural opening or passage, especially one into or through a bone." Dorland's at 729.

origin" (Tr. 22).[10]   The MRI revealed no disc herniation (Tr. 219-20).[11]

Plaintiff returned to the emergency room of Beth Israel on January 18, 2011.  The sole diagnosis on this date was "spinal cord disease," and plaintiff received four referrals; he was referred to a Dr. Donna Finkelstein, again to Dr. Maniker, to a Pain & Palliative Care Center, and to "Family Practice- Phillips" (Tr. 223).

### 2. Medical Treatment and Examination between January 19,2011 and April 4, 2011

Between the date of his application (January 19, 2011) and the date of the initial denial of his application for SSI and DIB (April 4, 2011), plaintiff continued to visit Beth Israel and was also evaluated by two consulting physicians.

---

[10] Neoplasm refers to any new and abnormal growth; specifically a new growth of tissue that is uncontrolled and progressive.  Dorland's at 1239.  Glia or glial refers to "neuroglia," which is "the supporting structure of nervous tissue.  It consists of a fine web of tissue made up of modified ectodermal [(a layer of cells from which epidermal tissues are formed)] elements, in which are enclosed peculiar branched cells known as neuroglial cells or glial cells."  Dorland's at 591, 783, 1265.

[11] A herniated disk is the protrusion of the nucleus pulposus or anulus fibrosus of an intervertebral disk, which may impinge on spinal nerve roots.  Dorland's at 852.

a. <u>Visits to Beth Israel</u>

Plaintiff returned to Beth Israel on January 31, 2011, complaining of back pain that radiated to his neck, legs and arms (Tr. 217-18). Dr. M. Felsen observed that plaintiff was in no acute distress (Tr. 217). Plaintiff had no lower extremity edema[12] or tenderness, but reported low back pain with heel walking, on extension of the quadriceps muscle and during hip flexion (Tr. 217). Dr. Felsen reported that there was spinal tenderness with palpation[13] of the thoracic vertebra (Tr. 217). Dr. Felsen's assessment was back pain, and he referred plaintiff for pain management and a spinal evaluation and told plaintiff to return to the clinic in two weeks (Tr. 217). He also prescribed Percocet and, at plaintiff's request, a multivitamin infusion (Tr. 217).

Plaintiff returned to Beth Israel almost two months later on March 23, 2011 and was seen by nurse practitioner ("NP") Kunimi Togashi-Ehresmann (Tr. 264-66). Plaintiff told Togashi-Ehresmann that he had worked in Pennsylvania until he was

[12] Edema refers to swelling due to the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body. <u>Dorland's</u> at 593.

[13] Palpation is the act of feeling with the hand or the application of the fingers with light pressure to the surface of the body for the purpose of making a physical diagnosis of the parts beneath. <u>Dorland's</u> at 1365.

laid off from his job (Tr. 264).  He further noted that he
returned to Pennsylvania because his "disability lawyer is there"
(Tr. 264).  Plaintiff also reported that he had been prescribed
the opiate medication oxycodone by his primary care physician
with a dose of 10 mg every six hours, but that he was taking
thirteen to fourteen tablets per day (Tr. 264) ("His [primary
care physician] prescribed oxycodone 10mg 1 tab q6hrs, however,
he is taking 13-14 tabs per day.").[14]  Plaintiff reported that
his pain was manageable when he is on the medication, but, when
he was not taking his medication, the pain was a ten on a scale
of one to ten (Tr. 264).  Plaintiff claimed that a scheduled
neurosurgery for his back condition had been delayed due to a
change in insurance carriers; he also stated that he had an April
5, 2011 appointment with a neurosurgeon (Tr. 264).  NP
Togashi-Ehresmann noted that plaintiff had previously used
diludid and morphine sulfate for pain (Tr. 264).

On examination, NP Togashi-Ehresmann observed that
plaintiff was in no acute distress and had normal muscle tone
(Tr. 265).  NP Togashi-Ehresmann noted that there was tenderness
on palpation of the T11-L1 disc space, but there was no evidence

---

[14]  In an apparent reference to a past prescription of
oxycodone from a different doctor, Togashi-Ehresmann's notes from
this day also state: "He was given 30mg from MD in PA and was
taking 2 tab 3 times a day" (Tr. 264).

of muscle spasm (Tr. 265).  NP Togashi-Ehresmann further observed
that plaintiff had full motor strength in his upper extremities;
however, she was unable to test plaintiff's lower extremities
fully due to plaintiff's complaints of pain (Tr. 265).  NP
Togashi-Ehresmann's assessment was back pain, and
"thoracic/lumber [sic] radiculitis"[15] (Tr. 265).  She prescribed
oxycodone 30mg for plaintiff, but advised him to take no more
than four pills per day (Tr. 265).  She also advised plaintiff to
follow up with a neurosurgeon and to return to the clinic in one
month (Tr. 265).

> b.  Consulting Examination:
>     Physical Residual
>     Functional Capacity Assessment

At the request of agency adjudicator, W. Cooley,
plaintiff met with an independent physical examiner prior to the
issuance of the initial decision on his application (Tr. 20, 229-
33).  Ira Rubenfeld, M.D. examined plaintiff in March of 2011
(Tr. 228-36).[16]  Plaintiff complained of radiating back pain and

------

[15] Radiculitis refers to inflammation of the root of a
spinal nerve, especially of that portion of the root which lies
between the spinal cord and intervertebral canal.  Dorland's at
1571.

[16] The record does not clearly identify the date of Dr.
Rubenfeld's examination of plaintiff; his treatment notes are
dated March 25, 2011 (Tr. 234).

stated that he was to undergo surgery for what he characterized as a tumor on his spine (Tr. 234). He reported that he took oxycodone three times each day, which helped him (Tr. 234-35). Plaintiff told Dr. Rubenfeld that he was not able to sit up, move or walk but that he was able to perform the activities of daily living such as dressing, showering, cooking and shopping (Tr. 234). Plaintiff also complained of intermittent urinary incontinence (Tr. 234).

Dr. Rubenfeld reported that plaintiff's range of motion, gait and station were all normal (Tr. 236; Tr. 230-31 (range of motion test results)). Plaintiff had positive straight leg raising bilaterally,[17] diminished sensation in the lower extremities and diffusely diminished reflexes (Tr. 235-36). Plaintiff's motor strength was normal (5+ out of 5+) (Tr. 236). Dr. Rubenfeld observed that plaintiff could get on and off the examination table without assistance, could stand on his heels and toes, and could squat (Tr. 235-36). He also observed that plaintiff had a prominent lumbar curve (Tr. 236). Dr. Rubenfeld

---

[17] A straight leg-raising test is where, with the "patient lying supine, the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved." Dorland's at 1900.

reviewed plaintiff's MRI from Beth Israel and opined that it was "most likely consistent with an epidermoid" (Tr. 234).

Dr. Rubenfeld also completed an assessment of plaintiff's functioning (Tr. 232-33).  Dr. Rubenfeld opined that plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, had no limitations in sitting, standing, walking, pushing and pulling and could occasionally bend, kneel, stoop, crouch, balance, and climb (Tr. 232-33).

c.  Consulting Physician:
   Dr. Hong S. Park

On April 4, 2011, Dr. Hong S. Park, a state agency physician, reviewed the medical evidence in the record, and assessed plaintiff's functioning (Tr. 52-59).  Dr. Hong did not actually examine plaintiff.  Dr. Hong opined that plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, could stand or walk for about six hours in an eight-hour workday, could sit for about six hours in an eight-hour workday and could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 56-57).  Dr. Hong's primary diagnosis was "Disorders of Back (Discogenic and Degenerative)" with a secondary diagnosis of "Benign Neoplasm of Brain and Other Parts of Nervous System" (Tr. 52).  Dr. Hong opined that plaintiff was

12

not disabled and that while his condition resulted in "some
limitations" on his ability to work, those limitations did not
prevent him from performing his past work as a parking lot
attendant (Tr. 59).

> 3. Visits to Beth Israel between
> <u>April 5, 2011 and August 2011</u>

Following the agency's initial denial of plaintiff's
application for benefits and plaintiff's request for a hearing,
plaintiff continued to visit Beth Israel for treatment.

On April 8, 2011, Plaintiff again met with NP
Togashi-Ehresmann. At that time, plaintiff stated that he had
gotten oxycodone 10mg tablets from Dr. Akeda but that the dose
was insufficient to manage his pain; the NP and plaintiff dis-
cussed plaintiff's taking 30mg tablets of oxycodone on an "as
needed" basis (Tr. 264). Plaintiff informed the NP that he
rescheduled his neurosurgery appointment with Dr. Chan to a later
date (Tr. 259, 264).

On May 4, 2011, plaintiff visited Beth Israel where he
met with Dr. Richard Cruciani and NP Togashi-Ehresmann. Dr.
Cruciani's assessment from that visit was consistent with NP
Togashi-Ehresmann's March 23, 2011 examination of plaintiff (Tr.
263, 265 (in both instances assessing plaintiff for "back pain"

13

and "thoracic/lumber [sic] radiculitis" and indicating "UDT
consistent")).  He also reported that plaintiff's treatment for
back pain consisted of 30mg of oxycodone, taken no more than four
times per day (Tr. 263).  Plaintiff reported that his current
pain management regimen was acceptable and denied any side
effects (Tr. 259).  Plaintiff stated that his surgery was still
pending and was advised by the Beth Israel staff to follow up
with a neurosurgeon and to return to the clinic in one month (Tr.
259, 263).

        From June 2011 through September 2011, plaintiff was
seen on approximately a monthly basis at Beth Israel during which
time he reported that his pain management was acceptable and his
treatment produced no side effects.  The summaries of those
visits are recorded in a report that identifies Dr. Eli Soto, Dr.
Cruciani, and NP Togashi-Ehresmann as the medical professionals
that treated plaintiff (Tr. 243-47, 250-51, 255-56, 259-60).

        In June 2011, plaintiff continued to report that his
pain management was acceptable, and he denied having any side
effects (Tr. 259).  Plaintiff related that he had sought treat-
ment while in Rhode Island for a recent episode of left arm
discomfort and numbness and noted that the condition was improv-
ing (Tr. 259).  As of that time, plaintiff had still not seen a
neurosurgeon and did not have an appointment (Tr. 259).

At an examination in July 2011, plaintiff stated that he had had an "insurance lapse" due to having lost his identification (Tr. 259-60).  Because plaintiff had exhausted his supply of pain medication four days earlier than he should have, he was counseled about "self-escalation" of medication (Tr. 259).  Plaintiff reported no side effects or withdrawal symptoms from his medication (Tr. 259).  At a subsequent examination in July, plaintiff stated that he had resolved the problem with his insurance coverage and that he could resume treatment at Beth Israel (Tr. 260).  He was again counseled on self-escalation of medication and advised to keep a pain diary (Tr. 260).

The Beth Israel notes from August 2011 indicate that plaintiff stated he was doing "ok" on his current dosage of a maximum of five pills per day and denied having any side effects (Tr. 260).

#### 4.  Dr. Erika Blank's Medical Source Statement dated September 14, 2011

The record also contains a document authored by Dr. Erika Blank, an internist affiliated with Beth Israel (Tr. 34, 238-241).  On September 14, 2011, Dr. Blank completed a "medical source statement" about plaintiff's ability to do "work-related activities (physical)" (Tr. 239-40).  Dr. Blank's statement

indicates that she had first seen plaintiff nine months earlier
and treated him every two to three months thereafter (Tr. 239).
There were no treatment notes submitted with Dr. Blank's medical
source statement.[18]

Dr. Blank's diagnosis was scoliosis and "(concern for)
intramedullary tumor at T11" (Tr. 239).  She noted that plaintiff
needed to have a biopsy done on the tumor for a further determi-
nation of his condition (Tr. 240).  She opined that, in an
eight-hour workday, plaintiff could sit for up to two hours,
stand or walk for up to three hours, and would need to change
positions every hour (Tr. 239).  She also noted that plaintiff
did not require an assistive device for walking (Tr. 239).  Dr.
Blank opined that plaintiff could lift and carry up to twenty
pounds frequently (Tr. 239).  She further opined that he could
rarely climb, bend/stoop, and balance and could never kneel or
crouch (Tr. 239).  Dr. Blank wrote that plaintiff had no limita-
tions on his ability to perform manipulations or to reach (Tr.
240).  Dr. Blank also opined that plaintiff would likely be

---

[18] Due to the lack of treatment notes, the ALJ kept the
record open for fourteen days following the hearing so that
plaintiff's attorney could locate and provide additional informa-
tion from Dr. Blank (Tr. 16).  No additional information from Dr.
Blank was ever provided, and plaintiff's counsel confirmed that
the record was complete prior to the ALJ's issuance of a written
decision (Tr. 16, 33-34, 204, 206).

absent up to two times each month due to his impairment or treatment (Tr. 240).

Dr. Blank's statement includes a notation directing plaintiff to take 30 mg of oxycodone every six hours for two weeks, but due to the lack of treatment notes from Dr. Blank it is unclear whether Dr. Blank provided plaintiff with a prescription (Tr. 241).  Dr. Blank listed plaintiff's medical problems as back pain, "intramedurally neoplasm," G6PD,[19] scoliosis, and substance abuse (Tr. 241).

### 5.  Visits to Beth Israel between September 28, 2011 and September 13, 2012

The summaries in the record of visits to Dr. Soto, Dr. Cruciani, and NP Togashi-Ehresmann at Beth Israel resume as of September 28, 2011 and continue through September 13, 2012 (Tr. 243-44, 246-47, 250-51, 255-56, 259-62).

Plaintiff returned to see NP Togashi-Ehresmann on September 28, 2011 and October 26, 2011 and reported to her that he had an appointment with a neurosurgeon on November 7 (Tr. 260).  The record of the September 28, 2011 appointment indicates

---

[19] G6PD refers to "Glucose-6-phosphate dehydrogenase deficiency" which is "the most common inborn error of metabolism, an X-linked enzyme deficiency causing varying degrees of hemolytic anemia."  Dorland's at 790.

that plaintiff received a prescription for oxycodone that day and that he denied any side effects (Tr. 260).

Plaintiff missed his scheduled appointment with NP Togashi-Ehresmann in November.  On December 2, 2011 he came to the clinic and reported that he had run out of medication (Tr. 260).  The results of NP Togashi-Ehresmann's examination of plaintiff that day are essentially identical to those reported in March 2011 (Tr. 261, 265).  Togashi-Ehresmann noted that plaintiff's muscle tone and range of motion were normal (Tr. 261).  Togashi-Ehresmann's assessment remained back pain, and "thoracic/lumber [sic] radiculitis" (Tr. 261).  Plaintiff continued to report that he had no side effects from his medication (Tr. 260).

On January 30, 2012, plaintiff reported to the Beth Israel staff that his current medication regimen was acceptable, produced no side effects and that he had no new health problems (Tr. 256).

On March 29, 2012, plaintiff returned to NP Togashi-Ehresmann (Tr. 255-57).  Plaintiff again noted that he was not experiencing any problems with his medication regimen (Tr. 256).  Plaintiff also indicated that his insurance no longer covered his prescription for oxycodone and that he was paying for the medication with his own funds; Togashi-Ehresmann told plain-

18

tiff to follow up with the Medicaid office (Tr. 256).
Togashi-Ehresmann repeated her previously stated examination
findings and diagnosis (Tr. 257).  Plaintiff was seen again at
Beth Israel on April 27, 2012 and again reported that his medica-
tion was effective and that he was not experiencing any side
effects (Tr. 251).

Plaintiff returned to Beth Israel on June 13, 2012 to
request a refill of his prescription because his medications had
been stolen from his car (Tr. 251).  Plaintiff was given a new
prescription and was warned that it was his responsibility to
safeguard his medications and that his prescription would not be
replaced again (Tr. 251).  Plaintiff later told the Beth Israel
staff that he filed a claim with the police regarding the theft
(Tr. 251).

On July 18, 2012, plaintiff was seen by Dr. Cruciani of
Beth Israel (Tr. 250-53).  Plaintiff complained of radiating low
back pain, but denied having any numbness, loss of sensation,
incontinence or constipation (Tr. 251).  On examination, Dr.
Cruciani reported that plaintiff's memory was intact and his mood
was euthymic, although plaintiff expressed some anxiety about an
upcoming neurosurgery appointment (Tr. 252).  Plaintiff's sensa-
tion in his lower extremities was intact, and his motor strength
for his upper and lower extremities was equal (Tr. 252).  His

gait was steady (Tr. 252).   Dr. Cruciani performed a straight leg
test on plaintiff which was positive bilaterally for pain at
sixty degrees to plaintiff's lower back (Tr. 252).   Dr. Cruciani
observed that plaintiff's muscle tone was equal and symmetrical
throughout his body, and that his range of motion was intact (Tr.
252).   Plaintiff's deep tendon reflexes for his ankles and
patellae (knee caps) were rated 2+ (Tr. 252).   Dr. Cruciani's
assessment was back pain, and "thoracic/lumber [sic] radiculitis"
(Tr. 252).

        Plaintiff was seen at Beth Israel the following month
by Dr. Eli Soto (Tr. 247-49).   Dr. Soto reported that plaintiff's
back pain was stable on Percocet, and that he had been "followed
up by neurosurgery for glial tumor in the spinal cord but ha[d]
not been able to go for surgery due to insurance issues" (Tr.
247).   He further noted that plaintiff had not had any neurologic
deficits (Tr. 247).   Dr. Soto repeated the examination findings
made by Dr. Cruciani, noting that plaintiff planned an upcoming
consult with neurosurgery (Tr. 248; see Tr. 252).

        On September 13, 2012, two weeks before his administra-
tive hearing, plaintiff returned to Beth Israel and told Dr.
Cruciani that he was experiencing worsening low back pain (Tr.
243-45).   Plaintiff stated that he had run out of medication
three days earlier (Tr. 243).   He also indicated that he was

scheduled to see a surgeon the following month because "he got
his health insurance back" (T. 243).  On examination, Dr.
Cruciani found that plaintiff's motor strength was "preserved"
and that his sensory exam showed no lack of focus (Tr. 243).  Dr.
Cruciani observed that plaintiff's gait was antalgic[20] but steady
(Tr. 243).  Dr. Cruciani stated that plaintiff's posture was
"painfully guarded deviation. (+SLR [(straight leg raising)] 60
degrees bilat." and that there was "tenderness upon palpation"
(Tr. 243).  Dr. Cruciani's assessment remained back pain, and
"thoraco-lumbar radiculitis" (Tr. 243).

        D.   Proceeding
             <u>Before the ALJ</u>

        Scott Dye, Esq. of the firm of Eric A. Shore, PC.
represented plaintiff at the September 24, 2012 videoconference
hearing before ALJ Curt Marceille (Tr. 31).  Plaintiff and a
vocational expert testified at the hearing.  As noted above, the
ALJ kept the record open for fourteen days following the hearing
(Tr. 16).  Plaintiff's counsel submitted additional medical
records from Beth Israel on September 27 and confirmed on October

---

        [20] Antalgic means "counteracting or avoiding pain, as a
posture or gait assumed so as to lessen pain."  <u>Dorland's</u> at 97.

21

2, 2015 that the record before the ALJ allowed for full and fair consideration of plaintiff's claim (Tr. 203-04).

      1.   Videoconference Hearing:
          <u>Plaintiff's Testimony</u>

      Plaintiff testified at the administrative hearing that he stopped working at the Auto Labor Union a few years earlier because of excruciating pain (Tr. 36). Plaintiff testified that sometime after that he went to see Dr. Maniker, a spinal surgeon at Beth Israel, who tested plaintiff and found a tumor on his spine (Tr. 36-37). Plaintiff testified that he must change positions throughout the day due to pain and that he experiences pain up and down his back and numbness in his arms and legs (Tr. 36-37). Plaintiff testified that Dr. Maniker advised him approximately two years earlier to have surgery on his tumor but that he postponed that treatment due to a change in his insurance carriers (Tr. 37-38). Plaintiff testified that he was now covered by Medicaid, but had not seen a surgeon regarding the recommended treatment in a year (Tr. 37, 40-41). He testified that his current medical care consisted of pain management through the use of oxycodone and morphine (Tr. 36-39). Plaintiff testified that oxycodone does a "fairly good job" of managing his pain but he experienced side effects such as drowsiness, dimin-

ished concentration and constipation (Tr. 38-39, 43, 46).
Plaintiff testified that his pain is typically approximately a
seven out of ten when he is on the medication and an eight out of
ten when he is not on the medication (Tr. 43).

Plaintiff testified that he did not do any household
chores and rarely cooked (Tr. 38-39, 41). Plaintiff testified
that he mostly stays at home because he is unable to do anything
due to pain and the medication he takes for it (Tr. 38). His
aunt and cousin do "stuff" around the house to help him (Tr. 39).
Plaintiff testified that he is not able to sweep or mop the floor
and that his aunt and cousin do his laundry (Tr. 41-42).

Plaintiff testified that he spent his time reading or
watching news and other programs on television (Tr. 44). Plain-
tiff obtained a driver's license in 2010 but testified that he
did not drive (Tr. 42). Plaintiff testified that he did not go
anywhere on a regular basis and did not exercise (Tr. 44).
Plaintiff stated that he tries to lie down and stretch in differ-
ent ways to alleviate his pain (Tr. 44). Plaintiff testified
that he could sit or stand for up to one hour at a time, and
could lift objects weighing between thirty-five and forty pounds
(Tr. 46-47).

2.   Videoconference Hearing:
     Vocational Expert's Testimony

Edward Pagella testified as a vocational expert ("VE")
(Tr. 47-50, 105).  The ALJ posed hypothetical questions to the VE
and asked him to consider possible jobs for someone of plain-
tiff's age, education and work background who was limited to a
range of "light" work as defined in the SSA's regulations,
namely, lifting twenty pounds occasionally and ten pounds fre-
quently, sitting two hours per day, standing and/or walking six
hours per day and occasionally climbing, balancing, stooping,
crouching, and crawling (Tr. 48).  The VE testified that such an
individual could work in jobs described in the United States
Department of Labor's Dictionary of Occupational Titles ("DICOT")
such as hand [packager] (Tr. 49, citing DICOT § 559.687-074),
assembler (Tr. 49, citing DICOT § 701.687-010) and hand sorter
(Tr. 49, citing DICOT § 222.687-022).[21]  The ALJ then asked the
VE to identify possible "sedentary" jobs an individual with the
same background and limitations could do (Tr. 49).  The VE
responded that such an individual could work as a hand sorter
(DICOT § 689.687-014), assembler (DICOT § 734.687-018) and

---

[21] Although the expert described the job as a hand sorter,
the DICOT states that the job is entitled "routing clerk."  See
DICOT 222.687-022 (G.P.O.), 1991 WL 672133.

24

advanced packager (DICOT § 715.684-026)[22] (Tr. 49-50).  The VE
stated that the jobs identified existed in significant numbers in
the national and local economies (Tr. 49-50).  In addition, the
VE stated that if the individual needed to change positions from
sitting and standing every hour, the number of jobs he identified
under both hypotheticals would remain constant (Tr. 50).

       In response to questioning from plaintiff's attorney,
the VE testified that an individual who had to miss work two or
more days a month due to pain or the side effects from medica-
tions would be precluded from "all competitive work" (Tr. 50).

III.  Analysis

       A.  Applicable
           Legal Principles

           1.  Standard of Review

       The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per
curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012);

---

       [22]  Although the expert described the job as advanced
packager, the DOT states the job is actually entitled "bench
hand."  See DICOT 715.684-026 (G.P.O.), 1991 WL 679344.

Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."  Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015), quoting Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  Johnson v. Bowen, supra, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particu-

26

lar issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

     2.   Determination
         of Disability

A claimant is entitled to DIB and SSI if he can estab-lish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[23]  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535

---

[23] The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the former are equally applicable to cases involving the latter.

U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).  The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, supra, 722 F.2d at 1037 (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at

28

417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first
step is a determination of whether the claimant is engaged in
substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).  If he is not, the second step requires deter-
mining whether the claimant has a "severe medically determinable
physical or mental impairment."  20 C.F.R. §§ 404.1520(a)(4)(ii),
416.920(a)(4)(ii).  If he does, the inquiry at the third step is
whether any of these impairments meet one of the listings in
Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).  If the answer to this inquiry is affirma-
tive, the claimant is disabled.  20 C.F.R. §§
404.1520(a)(4)(iii), 416.920(a)(4)(iii).

        If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform his past relevant work given his RFC.  20 C.F.R.
§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas,
supra, 540 U.S. at 24-25.  If he cannot, then the fifth step
requires assessment of whether, given claimant's RFC, he can make
an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v),
416.920(a)(4)(v).  If he cannot, he will be found disabled.  20
C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in para- graphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[24]  20 C.F.R. §§ 404.1567, 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict claimant's ability to work.[25]  See Michaels v. Colvin,

---

[24] Exertional limitations are those which "affect [plain- tiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §§  404.1569a(b), 416.969a(b).

[25] Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instruc- tions, seeing or hearing, tolerating dust or fumes, or manipula- tive or postural functions, such as reaching, handling, stooping, (continued...)

621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v.
Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

      The claimant bears the initial burden of proving
disability with respect to the first four steps.  Once the
claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than his past
work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v.
Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377,
383 (2d Cir. 2004), amended in part on other grounds on reh'g,
416 F.3d 101 (2d Cir. 2005).

      In some cases, the Commissioner can rely exclusively on
the medical-vocational guidelines (the "Grids") contained in
C.F.R. Part 404, Subpart P, Appendix 2 when making the determina-
tion at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98
(N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's
RFC in conjunction with the claimant's age, education and work
experience.  Based on these factors, the Grid[s] indicate[]
whether the claimant can engage in any other substantial gainful
work which exists in the national economy."  Gray v. Chater,

_____

[25](...continued)
climbing, crawling or crouching.  20 C.F.R. §§ 404.1569a(c),
416.969a(c).

supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388
F.3d at 383.

Exclusive reliance on the Grids is not appropriate
where nonexertional limitations "significantly diminish [a
claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603
(2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.
"Significantly diminish" means "the additional loss of work
capacity beyond a negligible one or, in other words, one that so
narrows a claimant's possible range of work as to deprive him of
a meaningful employment opportunity." Bapp v. Bowen, supra, 802
F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421;
Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds
that the nonexertional limitations significantly diminish a
claimant's ability to work, then the Commissioner must introduce
the testimony of a vocational expert or other similar evidence in
order to prove "that jobs exist in the economy which the claimant
can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at
383-84 (internal quotation marks and citation omitted); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

3.  <u>Treating Physician Rule</u>

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians.  Under the regulations' "treating physician rule," a treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000); <u>Diaz v. Shalala</u>, 59 F.3d 307, 313 n.6 (2d Cir. 1995); <u>Schisler v. Sullivan</u>, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); <u>Schisler v. Sullivan</u>, <u>supra</u>, 3 F.3d at 568; <u>Burris v. Chater</u>, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'"  <u>Morgan v. Colvin</u>, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), <u>quoting</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 33 (2d Cir. 2004); <u>accord</u> <u>Greek v. Colvin</u>, 802 F.3d 370, 375 (2d Cir. 2015).  Before an ALJ can give a treating physician's opinion less than controlling

weight, the ALJ must apply various factors to determine the
amount of weight the opinion should be given.  These factors
include:  (1) the length of the treatment relationship and the
frequency of examination, (2) the nature and extent of the
treatment relationship, (3) the medical support for the treating
physician's opinion, (4) the consistency of the opinion with the
record as a whole, (5) the physician's level of specialization in
the area and (6) other factors that tend to support or contradict
the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6);
Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue,
07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28,
2009) (Rakoff, D.J.) (adopting Report & Recommendation); Matovic
v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan.
12, 1996) (McKenna, D.J.).  Although the foregoing factors guide
an ALJ's assessment of a treating physician's opinion, the ALJ
need not expressly address each factor.  Atwater v. Astrue, 512
F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no
such slavish recitation of each and every factor where the ALJ's
reasoning and adherence to the regulation are clear.").

        As long as the ALJ provides "good reasons" for the
weight accorded to the treating physician's opinion and the ALJ's
reasoning is supported by substantial evidence, remand is unwar-
ranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see

also <u>Atwater v. Astrue</u>, <u>supra</u>, 512 F. App'x at 70; <u>Petrie v. Astrue</u>, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); <u>Kennedy v. Astrue</u>, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).

B.  <u>The ALJ's Decision</u>

At step one, the ALJ found that plaintiff did not engage in substantial gainful activity at any time after the application date of January 19, 2011 (Tr. 18).

At step two, the ALJ found that plaintiff exhibits the signs and symptoms of degenerative disc disease, which is a "severe impairment" that "continues to significantly limit his ability to carry out basic work activities" (Tr. 18).  In making this finding, the ALJ appeared to rule out the other potential sources of plaintiff's pain that were identified in plaintiff's MRI results.  The ALJ noted that plaintiff's MRI revealed an "expansile intramedullary ovoid T2 hyperintensity with the claimant's distal thoracic spinal cord, at the T11 level" but that plaintiff had not complained of upper extremity issues in the last two years (Tr. 18).  In addition, the ALJ addressed the statement in plaintiff's MRI report that the "expansile intramedullary ovoid" disclosed in the MRI was "concerning for an intramedullary neoplasm of glial origin" (Tr. 220).  The ALJ

35

stated that "Mr. Dye[, plaintiff's attorney at the hearing,] did not submit any treatment notes from a neurosurgeon with regard to the treatment of this possible 'neoplasm of glilial [sic] origin'" and that the ALJ therefore did not classify the neoplasm as a severe impairment (Tr. 18).  Thus, the ALJ concluded that the source of plaintiff's chronic radiating lower back pain was not the potential neoplasm but was instead a degenerative narrowing of plaintiff's spinal components[26] at the L4-L5 level of plaintiff's lumbar spine (Tr. 18).

At step three, the ALJ found that plaintiff did not meet any of the listed impairments or combination of impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1 (Tr. 19).

At step four, the ALJ determined that plaintiff had no relevant past work history (Tr. 24).

At step five, the ALJ determined, based on the testimony of a vocational expert, that plaintiff had the RFC to perform "light" work (Tr. 19).[27]   In determining plaintiff's

---

[26] Although the ALJ's references to a "degenerative narrowing at the L4-L5 level" (Tr. 18) clearly refers to components of plaintiff's spine, neither the ALJ nor the record is clear as to which part of plaintiff's spinal components were "narrowing." The MRI report states that "[v]ery mild concentric disc bulge at L4-L5 contributes to minimal bilateral foraminal narrowing" (Tr. 220).

[27] As discussed above, RFC is defined as "the most [the claimant] can still do despite [his] limitations."  20 C.F.R. §§
(continued...)

RFC, the ALJ determined that plaintiff had the capacity to climb, balance, stoop, kneel, crouch, or crawl occasionally (Tr. 19). In support of the RFC finding, the ALJ relied upon the medical records provided by Beth Israel and the examination findings of the consulting physician, Dr. Rubenfeld (Tr. 19-24, 217-66).  As to Dr. Rubenfeld, the ALJ gave "great weight to this medical

---

[27](...continued)
404.1545(a)(1), 416.945(a)(1).

> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, you must have the ability to do substan-
> tially all of these activities.  If someone can do
> light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to
> sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

> Sedentary work involves lifting no more than 10 pounds
> at a time and occasionally lifting or carrying articles
> like docket files, ledgers, and small tools.  Although
> a sedentary job is defined as one which involves sit-
> ting, a certain amount of walking and standing is often
> necessary in carrying out job duties.  Jobs are seden-
> tary if walking and standing are required occasionally
> and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

source statement, because it is consistent with his findings and the earlier findings" (Tr. 21).

The ALJ discussed the fact that plaintiff first visited Beth Israel for treatment for back pain two weeks prior to filing his application for Social Security Benefits (Tr. 20).  The MRI taken of plaintiff's spine one day later did not disclose disc herniation and showed only a "very mild concentric disc bulge" and "'questionable' bilateral L5 spondylolys[i]s" (Tr. 20). Plaintiff's functioning did not appear to be impaired at that time; when plaintiff filed his application for SSI in January 2011, the field office employee noted that plaintiff sat "during whole interview without looking to be uncomfortable" and had no noticeable problems standing or walking (Tr. 20; see also Tr. 167).  Two weeks later, plaintiff was examined at Beth Israel and "did not display any actual objective abnormalities" (Tr. 20; see also Tr. 217).  The ALJ also cited a March 23, 2011 treatment note from Beth Israel reporting that plaintiff was able to move all his joints fully and had a normal gait but that testing of the lower extremities was incomplete "due to pain" (Tr. 20).

The ALJ noted that in March of 2011 Dr. Rubenfeld met with plaintiff and found that plaintiff had no limits on his ability to sit, stand or walk and that he could lift or carry "light" weights on a full-time basis (Tr. 21, 232-33).

The ALJ also found that there was nothing in the recent evidence to warrant finding a more limited RFC than that found by Dr. Rubenfeld.  Two weeks after plaintiff met with Dr. Rubenfeld, the Beth Israel staff noted that plaintiff did not display any objective abnormalities but reported pain "with heel walking, extension of quadriceps muscle and hip flexion bilaterally" (Tr. 20).  The ALJ noted that the sources at Beth Israel did not change their physical exam findings until June 2012 and did not "cast doubt on [plaintiff's] ability at all times in the interim to perform at least a limited range of light work" (Tr. 21).  The ALJ further noted that through September 2012, plaintiff contin-ued to report that his medication managed his pain adequately (Tr. 23).

The ALJ referred to Dr. Blank as the "presumed treating physician" and found that the record did not support many of her findings (Tr. 16, 21).  The ALJ noted that even "overlooking the fact that claimant did not appear to meet with Dr. Blank herself at any time" during the nine month period covered by her state-ment, the "objective findings (by both Dr. Rubenfeld and the sources at Beth Israel)" and other evidence refuted Dr. Blank's findings that plaintiff had a limited ability to sit and could not kneel at all and could only balance rarely (Tr. 21) (emphasis in original).  The ALJ stated that the "[a]side from the MRI

39

results, this nonspecialist source did not support her opinion"
with "'objective findings, clinical observations, and
symptomology'" as required by the regulations (Tr. 21, quoting 20
C.F.R. § 416.927(c)(3)).  The ALJ found that Dr. Blank's exclu-
sive reliance on the MRI report was insufficient to support her
conclusions because her opinions were not otherwise supported by
the record and because she failed to take into account other
factors, including plaintiff's ability to manage his pain with
medication.  The ALJ stated that "it is not enough to cite some
diagnostic abnormalities -- especially when [Dr. Blank] failed to
account for the claimant's ability . . . to manage his pain with
Oxycodone" (Tr. 21).

          Turning to plaintiff's subjective statements about his
disability, the ALJ acknowledged that it would be impermissible
to reject plaintiff's statements about his symptoms solely
because the objective medical evidence did not support them (Tr.
21, citing 20 C.F.R. § 416.929(c)(2)).  The ALJ found, however,
that plaintiff's credibility was belied by his lack of signifi-
cant work activity, the timing of his application (less than one
year from his release of prison) and the fact that his "living
situation" indicated an "economic motive" for his application
(Tr. 21).  The ALJ noted that although plaintiff alleged the
onset of the disability in June 2010, there are no records from

Beth Israel or any other medical provider earlier than January
2011 (Tr. 22).  The ALJ also noted that plaintiff's application
to the agency and statements to his doctors indicated that
plaintiff could engage in many activities that he claimed at the
hearing to be unable to do (Tr. 22-23).  The ALJ also noted that
despite the discrepancies in the statements made in his initial
SSI application and his statements at the hearing, due to the use
of oxycodone, plaintiff continued to weigh 180 pounds, "suggest-
ing an adequate amount of daily activity" (Tr. 21).  The ALJ also
discussed the fact that plaintiff consistently reported that his
use of prescription medication made his pain manageable (Tr. 23).

      Given plaintiff's RFC, age, education and work experi-
ence, the ALJ credited the VE's opinion that there were occupa-
tions involving "light" work that plaintiff could perform that
exist in significant numbers in the national economy (Tr. 24-25).

      Accordingly, the ALJ found that plaintiff was not
disabled (Tr. 25).

    C.  Analysis of the
       ALJ's Decision

      Plaintiff makes four arguments in support of his motion
for judgment on the pleadings:  (1) the ALJ committed legal error
by not giving "controlling weight" to the opinion of plaintiff's

treating physician, Dr. Blank; (2) the ALJ's credibility finding
with respect to plaintiff was not supported by substantial
evidence; (3) the ALJ's hypothetical questions to the VE included
assumptions that were not supported by substantial evidence and
(4) the ALJ committed legal error by failing to consider the
combined effect of all of plaintiff's medical conditions.  The
Commissioner contends that the ALJ's decision should be upheld
because it was made pursuant to the correct legal standards and
is based on substantial evidence.

### 1.   Treating Physician Rule

Plaintiff first argues that the ALJ improperly failed
to give "controlling weight" to the opinion of his treating
physician Dr. Blank and erroneously gave controlling weight to a
consulting physician.  Specifically, plaintiff argues that the
ALJ did not consider the length of the treatment relationship
with Dr. Blank, the nature and extent of the relationship, and
the evidence provided to support Dr. Blank's opinion (Memorandum
in Support of Plaintiff's Cross-Motion for Judgment on the
Pleadings And in Opposition to Defendant's Motion (D.I. 23) ("Pl.
Mem.") at 16).  Plaintiff also argues that although the ALJ
stated that he was giving "great weight" to the opinion of
consulting physician Dr. Rubenfeld, the record indicates that he

improperly gave Dr. Rubenfeld "controlling weight" in violation
of Social Security Ruling ("SSR") 96-2p, 1996 WL 374188 (July 2,
1996), which states that only treating sources can be given
controlling weight (Pl. Mem. at 16-17).

     The ALJ set forth good reasons for not giving Dr.
Blank's opinion controlling weight, and he did consider all of
the factors required by the regulations.

     With respect to the first two factors, the length,
nature and extent of the relationship, the ALJ recognized that
there was little evidence with respect to these factors.  Al-
though Dr. Blank claimed that she had been treating plaintiff for
nine months, in view of the lack of treatment notes, it was
unclear whether Dr. Blank actually met with plaintiff over that
time period or whether she was merely referring to the period of
time plaintiff had been treated at Beth Israel (Tr. 21).  Never-
theless, the ALJ stated that he was overlooking the fact that
there was no evidence that Dr. Blank personally met with plain-
tiff during the claimed period of treatment and was not discount-
ing her opinion on this basis (Tr. 21).

     As to the third factor -- medical support for the
treating physician's opinion -- the ALJ found that there was
insufficient medical support for Dr. Blank's opinion because she
did not support her opinions with objective findings other than

43

the MRI results (Tr. 21).  The ALJ noted that even though plain-
tiff went to the emergency room at Beth Israel complaining of
radiating lower back pain, the MRI of plaintiff's lumbar spine
revealed only a very mild concentric disc bulge at L4-L5, with
minimal foraminal narrowing of the spinal components and no disc
herniation (Tr. 20, 21, 219-20).  The ALJ further noted that Dr.
Blank's opinion did not address the fact that the medical records
reflected that plaintiff consistently reported good pain manage-
ment with his prescribed dose of medication (Tr. 21, 23).

As to the fourth factor, the ALJ determined that Dr.
Blank's assessment regarding the extent of plaintiff's impair-
ments was inconsistent with the balance of the medical record.
The ALJ noted that the clinical findings of the other physicians
who had examined plaintiff did not support Dr. Blank's opinion
that plaintiff could sit for no more than two hours each work day
and could balance only "rarely" (Tr. 21; 238-41).  For example,
Dr. Rubenfeld reported in March 2011 that plaintiff's range of
motion, motor power, and gait and station were all normal (Tr.
20-21, 230-36).  Dr. Rubenfeld also opined that plaintiff could
lift and carry up to twenty pounds occasionally and ten pounds
frequently, had no limitations in sitting, standing, walking, or
pushing and pulling, and could occasionally bend, kneel, stoop,
crouch, balance, and climb (Tr. 21, 232-33).  Further, the

44

treatment notes from Beth Israel in the months following Dr.
Rubenfeld's examination consistently noted that plaintiff dis-
played full strength and sensation in each extremity, was able to
move all joints fully and to raise each leg sixty degrees without
lower bank pain, and described plaintiff as "euthymic" or normal
and not depressed (Tr. 21).  Aside from one notation from Dr.
Cruciani in September 2012 that plaintiff had a steady but
antalgic gait (Tr. 243), all the examining medical professionals
either reported that plaintiff had a normal gait or observed no
gait abnormality or lack of steadiness (Tr. 20, 21; See, e.g.,
Tr. 235, 252, 265).  After plaintiff received a refill of his
prescription, Dr. Cruciani reported in July 2012 that plaintiff's
sensation in his lower extremities was intact, his motor strength
in his upper and lower extremities was equal and his gait was
steady (Tr. 23, 252).

        As to the fifth factor, Dr. Blank's specialization, the
ALJ noted that Dr. Blank was a "nonspecialist" but did not
indicate the significance he was attaching to this fact (Tr. 21).

        Further, the ALJ did not improperly discount Dr.
Blank's opinion entirely or give Dr. Rubenfeld's opinion "con-
trolling weight."  Because Dr. Blank's opinion was unaccompanied
by treatment notes, Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d
Cir. 1983) (The Commissioner is "entitled to rely not only on

45

what the record says, but also on what it does not say."); <u>Martin
v. Astrue</u>, 337 F. App'x 87, 89 (2d Cir. 2009) (summary order) ("a
lack of evidence of severe impairment constitutes substantial
evidence supporting a denial of benefits"), the ALJ compared Dr.
Blank's opinions to the medical records that were before him.
The ALJ found that Dr. Rubenfeld's conclusions, rather than Dr.
Blank's, were the most consistent with plaintiff's own statements
regarding his pain management, the opinions of the Beth Israel
staff who had been treating plaintiff since January 2011, and the
medical testing results (Tr. 21-22).  Further, in consideration
of Dr. Blank's and plaintiff's statements, the ALJ "out of
abundance of caution" did find that plaintiff's ability to stoop,
kneel, crouch, balance or climb was limited, but did not find
that he was entirely unable to perform these activities or could
engage in them only "rarely" (Tr. 21).  Thus, because Dr. Blank's
opinion was "contradicted by other substantial record evidence,"
the ALJ did not commit legal error by not giving Dr. Blank's
opinion controlling weight.  See <u>Fox v. Colvin</u>, 589 F. App'x 35,
36 (2d Cir. 2015) (summary order); <u>Veino v. Barnhart</u>, 312 F.3d
578, 588 (2d Cir. 2002) ("While the opinions of a treating
physician deserve special respect . . . they need not be given
controlling weight where they are contradicted by other substan-
tial evidence in the record" (citations omitted)).

Further, the ALJ's decision to give greater weight to Dr. Rubenfeld's opinion than he gave to Dr. Blank's was not erroneous nor does it demonstrate that the ALJ gave Dr. Rubenfeld's opinion "controlling weight." (Tr. 21). The ALJ was entitled to give more weight to this examining source when his opinion was supported by substantial evidence. See Negron ex rel. M.C.N. v. Comm'r of Soc. Sec., 11 Civ. 8645 (KBF), 2013 WL 2896845 at *6 (S.D.N.Y. June 12, 2013) (Forrest, D.J.) ("The opinions of non-treating sources such as consulting physicians can constitute substantial evidence and even override the opinions of treating physicians if they are supported by the record."); Fessler v. Astrue, 09 Civ. 6905 (WHP)(JCF), 2011 WL 346553 at *9 (S.D.N.Y. Jan. 10, 2011) (Francis, M.J.) (Report & Recommendation) ("Under 20 C.F.R. § 404.1527, not only may the reports of consultative or non-examining physicians constitute substantial evidence as to disability, but they may override the opinions of treating physicians in appropriate circumstances."), adopted at, 2011 WL 382973 (S.D.N.Y. Feb. 3, 2011) (Pauley, D.J.); see also Cichocki v. Astrue, supra, 534 F. App'x at 75; Wavercak v. Astrue, 420 F. App'x 91, 94 (2d Cir. 2011) (summary order); Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998). Further, as discussed above, although the ALJ found that the objective evidence supported Dr. Rubenfeld's conclusions, he did

give some weight to Dr. Blank's opinions and assumed that plaintiff's exertional abilities were limited even though Dr. Rubenfeld believed those limitations were not present (Tr. 21). Thus, the ALJ did not improperly give Dr. Rubenfeld's opinion "controlling weight."

The ALJ correctly "applied the substance of the treating physician rule" by considering the medical support for Dr. Blank's opinion and the consistency of her opinions with the other evidence in the record, Halloran v. Barnhart, supra, 362 F.3d at 32, and gave "good reasons" for not giving Dr. Blank's opinion controlling weight.  20 C.F.R. §§ 404.1527(c), 416.927(c).  Thus, the ALJ's application of the treating physician rule was not erroneous.

### 2.  Credibility Assessment

Plaintiff next argues that the ALJ's determination that plaintiff retained the RFC to do "light work" was not supported by substantial evidence because the ALJ failed to give specific reasons for discounting plaintiff's testimony and, therefore, failed to consider all of the evidence in the record as required by SSR 96-7p, 1996 WL 374186 (July 2, 1996).  Specifically, plaintiff argues that the ALJ "essentially ignored the plaintiff's testimony" that would have established that he was dis-

48

abled (Pl. Mem. at 19-20).  The Commissioner argues that the ALJ
reasonably found that plaintiff's subjective complaints of
disabling symptoms were not entirely credible (Defendant's Motion
for Judgment on the Pleadings (D.I. 20) ("Def. Mem.") at 5-7).

     In determining a claimant's RFC, the ALJ is required to
consider the claimant's reports of pain and other limitations, 20
C.F.R. § 416.929, but is not required to accept the claimant's
subjective complaints without question.  McLaughlin v. Sec'y of
Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980).
"It is the function of the [Commissioner], not [the reviewing
courts], to resolve evidentiary conflicts and to appraise the
credibility of witnesses, including the claimant."  Carroll v.
Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983);
see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984);
Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588,
591-92 (2d Cir. 1984).  The ALJ has discretion to weigh the
credibility of the claimant's testimony in light of the medical
findings and other evidence in the record.  Marcus v. Califano,
615 F.2d 23, 27 (2d Cir. 1979).

     The regulations provide a two-step process for evaluat-
ing a claimant's subjective assertions of disability.

         At the first step, the ALJ must decide whether the
         claimant suffers from a medically determinable impair-
         ment that could reasonably be expected to produce the

symptoms alleged.  20 C.F.R. § 404.1529(b).  That
requirement stems from the fact that subjective asser-
tions of pain alone cannot ground a finding of disabil-
ity.  20 C.F.R. § 404.1529(a).  If the claimant does
suffer from such an impairment, at the second step, the
ALJ must consider "the extent to which [the claimant's]
symptoms can reasonably be accepted as consistent with
the objective medical evidence and other evidence" of
record.  Id.  The ALJ must consider "[s]tatements [the
claimant] or others make about [his] impairment(s),
[his] restrictions, [his] daily activities, [his]
efforts to work, or any other relevant statements [he]
make[s] to medical sources during the course of exami-
nation or treatment, or to [the agency] during inter-
views, on applications, in letters, and in testimony in
[its] administrative proceedings."  20 C.F.R. §
404.1512(b)(3); see also 20 C.F.R. § 404.1529(a);
S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis

in original); see also 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §

404.1529(a); 20 C.F.R. § 416.929(a); SSR 96-7p, 1996 WL 374186

(July 2, 1996).  The ALJ must explain his decision to reject a

claimant's testimony "'with sufficient specificity to enable the

[reviewing] Court to decide whether there are legitimate reasons

for the ALJ's disbelief' and whether his decision is supported by

substantial evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250,

280 (S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in original),

quoting Fox v. Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at

*12 (N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp.

2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determina-

tion of credibility is entitled to deference.  See Snell v.

Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ
is in a better position to decide issues of credibility");
Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)
(Leisure, D.J.) ("Deference should be accorded the ALJ's determi-
nation because he heard Plaintiff's testimony and observed his
demeanor.").

        The ALJ made a proper credibility determination and
that determination is supported by substantial evidence.  Apply-
ing the two-step framework set forth above, the ALJ did not
completely reject plaintiff's complaints of pain or physical
limitations, but rather found that given the overall record,
plaintiff's medically determinable impairments would allow for
the performance of "a limited range of light work" (Tr. 20).

        As to the first step, the ALJ identified plaintiff's
physical impairment as being due to a "degenerative narrowing [of
his spinal components] at the L4-L5 level" (Tr. 18-19).  The ALJ
described and quoted from plaintiff's statements regarding his
disability; the ALJ then noted that plaintiff was asserting that
the limiting effects of his "spinal cord disease"

            do not allow him to carry out the physical demands of
            any type of full-time remunerative work.(Exs. 2E:2,
            2F:3, Hearing Testimony).  He alleged shortly after the
            filing that the pain did not allow him to bend over
            with ease. (Ex. 3E:2).  He did not have the strength or
            patience to tolerate "long periods" sitting or to lift
            more than l5 pounds. (Ex. 3E:2,6).  He did not drive

> "due to the effects ["loopy" sensation] of medication."
> (Ex. 3E:1,4).  He did not attempt to estimate "how long
> [he] can pay attention," noting that the "time varies
> on effects of medication." (Ex. 3E:6).

(Tr. 19, _citing_ Tr. 170, 175, 176, 180, 224).  The ALJ did not

find medical record support for a "neoplasm of glilial [sic]

origin" identified plaintiff's MRI report and noted in Dr.

Blank's report and did not, therefore, classify this as a severe

impairment (Tr. 19).

At the second step, the ALJ found that plaintiff's

asserted symptoms were not generally consistent with the objec-

tive medical evidence and other evidence in the record, including

plaintiff's own statements to his physicians and the agency.

As a general observation, the ALJ noted that plain-

tiff's testimony was not consistent with the objective diagnostic

testing, which the ALJ found did not demonstrate an impairment

that would cause symptoms to the degree that plaintiff claimed

(Tr. 19-22).  As noted above, the ALJ explained that the MRI did

not reveal a disc herniation or severely bulging discs and

instead showed minor diagnostic abnormalities that were not

accompanied by significant functional impairments (Tr. 20-21).

Dr. Blank also expressed a "concern" regarding the "neoplasm"

identified in the MRI and stated that a biopsy should be done

"for further determination of prognosis" (Tr. 240).  The ALJ

noted, however, that one year after the MRI, there were no treatment notes regarding the treatment of the potential neoplasm (Tr. 18).

The ALJ also took note of the inconsistency between plaintiff's initial SSI application and statements to his doctors on the one hand and his hearing testimony on the other hand.  The ALJ noted that in his initial application in January 2011, plaintiff stated that he engaged in various activities notwith-standing his complaints of debilitating symptoms, including showering each day, dressing himself, sweeping, mopping, doing his own laundry, preparing his own vegetarian meals, using the internet and watching television (Tr. 22, 175-77).  The ALJ noted that plaintiff did not allege incontinence or report any other problems with his ability to use the toilet (Tr. 22).  The ALJ also noted that plaintiff was able to walk without limitation, could lift at least 15 pounds, did not use an assistive device or orthotic brace and could shop for food on a regular basis for an hour at a time (Tr. 22).  The ALJ also noted that when plaintiff met with an SSA representative to file his application, he appeared comfortable and was able to sit during the interview, concentrate and relate coherently (Tr. 20, 167).

The ALJ further noted that contrary to plaintiff's testimony (Tr. 38-39), plaintiff told his treating sources that

53

his prescribed medication produced no significant side effects
and was effective in managing his pain (Tr. 22-23, 246, 251, 256,
259, 260).  See 20 C.F.R. § 416.929(c)(3)(iv) ("Factors relevant
to your symptoms, such as pain, which we will consider include .
. . [t]he type, dosage, effectiveness, and side effects of any
medication you take or have taken to alleviate your pain or other
symptoms").  In the months immediately preceding the hearing,
plaintiff consistently reported "adequate pain control" with the
oxycodone, and, although he complained on occasion of radiating
pain, he did not report to his doctors the issues he claimed at
the hearing such as persistent numbness, urinary/fecal inconti-
nence and constipation (Tr. 23 (citing to March, April, July and
August 2012 Beth Israel reports)).  As a further example, the ALJ
found that plaintiff's claims to Dr. Rubenfeld -- that he could
not sit up or walk -- were contradicted not only by the Dr.
Rubenfeld's findings, but by plaintiff's statements to other
medical professionals shortly before and after his visit to Dr.
Rubenfeld that his prescribed dosage of oxycodone was effective
in managing his pain (Tr. 23, 234).

        The ALJ did not credit plaintiff's statement that he
experienced "'7/10' pain (even with medication) each and every
day" (Tr. 24).  The ALJ noted that plaintiff did not ask to
change his medication regimen even though one of the Beth Israel

staff asked him whether his dosage was sufficient and discussed
with him the importance of letting his physicians know if the
dosage was insufficient, nor did plaintiff pursue any alternative
treatment such as surgery (Tr. 23, 260).  See 20 C.F.R. §
416.929(c)(3)(v).  Indeed, there was no evidence in the record
that plaintiff ever even visited a neurosurgeon (Tr. 23).

        The ALJ noted that plaintiff admitted at the hearing
that the oxycodone "helps" him and that he did not need to use an
assistive device or orthotic brace on a regular basis (Tr. 23).
He testified that he could sit or stand for at least an hour
without interruption and could lift "'maybe' 35 to 40 pounds"
(Tr. 24).  It was reasonable for the ALJ to find that plaintiff
was not disabled based on his demonstrated ability to manage his
pain.  See Dumas v. Schweiker, supra, 712 F.2d at 1552
("[D]isability requires more than mere inability to work without
pain.  To be disabling, pain must be so severe, by itself or in
conjunction with other impairments, as to preclude any substan-
tial gainful employment").

        The ALJ also considered other evidence that adversely
affected plaintiff's credibility, including the fact that plain-
tiff filed his claim shortly after having been released from
prison (Tr. 21, 21 n.2 , 150, 159-602).  The ALJ also noted that
"[o]wing to his regular use of Oxycodone the claimant continued

55

to weigh 180 lbs, suggesting an adequate amount of daily activ-
ity" (Tr. 21).  The ALJ found that there was no reason to believe
plaintiff's claims that between plaintiff's application in early
2011 and the hearing on plaintiff's application in September
2011, there was a marked decrease in plaintiff's ability to take
care of himself, to sweep, and to mop (Tr. 24).  The ALJ found
that it was "unlikely" that plaintiff had been unable to drive
his car for several months and pointed out that although plain-
tiff testified at the hearing that he could not drive, he also
claimed that his medication had been stolen from his car a few
months earlier (Tr. 24).

   The ALJ did not completely reject plaintiff's subjec-
tive complaints of pain and did take them into account in finding
that plaintiff was only able to perform light work (Tr. 21).
Although the ALJ agreed with Dr. Rubenfeld that there was no
objective basis to limit plaintiff's stooping, kneeling, crouch-
ing, balancing, or climbing, the ALJ agreed, "out of an abundance
of caution," to find that plaintiff was "limit[ed] to occasional
postural maneuvering" (Tr. 21).

   In sum, the ALJ followed the relevant agency rulings
and provided numerous, specific and substantiated reasons for not
fully crediting plaintiff's subjective claims.  For all the
foregoing reasons, the ALJ's conclusion that plaintiff's com-

plaints about the magnitude of his symptoms were not entirely

credible was supported by substantial evidence.

### 3.   Vocational Expert Testimony

Plaintiff next argues that the two hypotheticals the

ALJ posed to the VE did not yield relevant evidence because they

assumed facts that were not supported by substantial evidence.[28]

_____

[28] The ALJ first posed the following hypothetical to the VE:

> I'd like you to assume an individual the claimant's
> age, education, and work history.  Assume that this
> individual is capable of performing light work with the
> defined [phonetic] regulations, lifting 20 pounds
> occasionally, 10 pounds frequently, standing, walking
> six of eight hours, sitting two of eight hours.  This
> individual can occasionally climb, balance, stoop,
> kneel, crouch, and crawl. If we assume those limita-
> tions, would there be any jobs for such an individual?

(Tr. 48).  The ALJ then posed the following second hypothetical
to the VE:

> Assume all the non-exertional, physical limitations of
> the first, but reduce it down to the sedentary levels
> defined in the regulations as lifting 10 pounds occa-
> sionally, less than 10 pounds frequently. Standing and
> walking -- standing would be two hours, sitting would
> be six hours.  Any jobs?

(Tr. 49).  The ALJ then asked the VE a follow-up question to his
two hypothetical questions:

> And if the individual could only sit and stand for a
> maximum of one hour at a time before they would need to
> alternate positions, what impact, if any, would that
> have on the Jobs identified in the first and second
> > (continued...)

Plaintiff does not specifically identify any improper assumptions in the hypotheticals the ALJ posed to the VE; instead, plaintiff argues generally that the ALJ's hypotheticals

> appear to be based on the reports of the non-treating SSA consulting physician, Ira Rubenfeld, MD and a state agency physician, Hong S. Park, MD. . . . The ALJ failed to propose a hypothetical to the VE that is based on the substantial evidence in the record. The hypothetical that is based on the substantial evidence in the record would be based upon the treating source report of Erika Blank, MD.

(Pl. Mem. at 21). In support of the argument that the VE's testimony should be disregarded, plaintiff relies solely on his argument that Dr. Blank's opinion should have been given control-ling weight (Pl. Mem. at 20-21).

To meet his burden at step five, an ALJ may rely on a vocational expert's testimony in response to a hypothetical question so long as the facts assumed in the hypothetical are based on substantial evidence and accurately reflect the limita-tions and capabilities of the claimant involved. See Calabrese v. Astrue, 358 F. App'x 274, 276 (2d Cir. 2009) (summary order), citing Dumas v. Schweiker, supra, 712 F.2d at 1553-54 and Aubeuf

---

[28](...continued)
        hypothetical?

(Tr. 50). As noted above, the VE identified jobs in the local and national economies that a person could perform assuming the restrictions identified in the ALJ's hypotheticals (Tr. 49-50).

v. Schweiker, 649 F.2d 107, 114 (2d Cir. 1981); see also Mancuso
v. Astrue, 361 F. App'x 176, 179 (2d Cir. 2010) (summary order);
Beach v. Comm'r of Soc. Sec., 11 Civ. 2089 (JMF), 2012 WL 3135621
at *13 (S.D.N.Y. Aug. 2, 2012) (Furman, D.J.); Harris-Batten v.
Comm'r of Soc. Sec., 05 Civ. 7188 (KMK)(LMS), 2012 WL 414292 at
*5 (S.D.N.Y. Feb. 9, 2012) (Karas, D.J.).

        As explained above, the ALJ made his RFC determination
according to the correct legal standards, by applying the treat-
ing physician rule properly and appropriately assessing the
plaintiff's credibility.  The ALJ assessed all of the medical
evidence in the record and concluded that Dr. Rubenfeld's assess-
ment of plaintiff's limitations was the most consistent with the
Beth Israel treatment notes and plaintiff's own statements to his
doctors (Tr. 20-22).  As discussed above, given Dr. Blank's
limited treatment notes, plaintiff's testimony regarding his pain
management and the opinions of Dr. Rubenfeld and the staff at
Beth Israel that treated plaintiff over the course of more than
one year, the ALJ did not err in giving Dr. Rubenfeld's opinion
more weight than Dr. Blank's in reaching his RFC determination.

        The ALJ's hypotheticals, moreover, did not rely solely
on Dr. Rubenfeld or any other source.  In fact, the ALJ recog-
nized that "[e]ven though [Dr. Rubenfeld's] examination did not

uncover an objective basis to limit [plaintiff's] stooping, kneeling, crouching, balancing, or climbing, [the ALJ] agree[d] -- like the agency's medical consultant -- to limit [plaintiff] to occasional postural maneuvering too, out of an abundance of caution" (Tr. 21). The hypotheticals posed to the VE reflected this additional limitation (Tr. 48, 49). Although the ALJ referred to Dr. Park by his title when limiting plaintiff to occasional maneuvering, it is apparent that the decision to ask the VE to assume greater limitations of plaintiff's abilities than were supported by the objective medical evidence was based on plaintiff's subjective complaints and Dr. Blank's opinion (Tr. 21).

Therefore, because the ALJ's assessment of plaintiff's RFC was based on substantial evidence, posing hypothetical questions to the VE based on that assessment was not erroneous.

4. Combined Effect
    Of Plaintiff's Conditions

Finally, plaintiff argues that the ALJ's decision was not supported by substantial evidence because the ALJ failed to consider the combined effect of plaintiff's multiple physical problems. According to plaintiff these were "bulging disk, cauda equina syndrome, 1.4cm x.9cm rounded intramedullary lesion that

60

displays characteristics that most likely correspond with an
epidermoid, bilateral L5 spondylolisthesis,[29] chronic back pain
and thoracic/lumbar radiculitis" (Pl. Mem. At 22).  The Commis-
sioner argues that the ALJ properly considered all of plaintiff's
conditions that were supported by the record.

    The Court of Appeals has stated that "the combined
effect of a claimant's impairments must be considered in deter-
mining disability; the SSA must evaluate their combined impact on
a claimant's ability to work, regardless of whether every impair-
ment is severe." <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1031 (2d Cir.
1995), <u>citing</u> <u>De Leon v. Secretary of Health & Human Servs.</u>, 734
F.2d 930, 937 (2d Cir. 1984); <u>Cutler v. Weinberger</u>, 516 F.2d
1282, 1285 (2d Cir. 1975).  However, an ALJ need not marshal
every piece of evidence that supports his RFC determination.

    Although an ALJ's RFC determination "must be set
    forth with sufficient specificity to enable us to
    decide whether the determination is supported by sub-
    stantial evidence," <u>Ferraris v. Heckler</u>, 728 F.2d 582,

---

    [29] Although plaintiff uses the phrase "bilateral L5
spondylolisthesis," in the quoted portion of his brief, I presume
that plaintiff is in fact referring to the MRI report's statement
regarding "bilateral L5 spondylolyses [<u>sic</u>]," which is a differ-
ent condition than spondylolisthesis.  <u>Dorland's</u> at 1754 (defin-
ing spondylolysis as defined in footnote 7 above and separately
defining spondylolisthesis as "forward displacement (olisthy) of
one vertebra over another[.]").  In any event, the MRI report
clearly discounts spondylolisthesis as a diagnosis (Tr. 220
("[n]o spondylolisthesis") and there is no other reference to
that condition in the record.

> 587 (2d Cir. 1984), "we do not require that [the ALJ]
> have mentioned every item of testimony presented to him
> or have explained why he considered particular evidence
> unpersuasive or insufficient to lead him to a conclu-
> sion of disability," Mongeur v. Heckler, 722 F.2d 1033,
> 1040 (2d Cir. 1983); see also Miles v. Harris, 645 F.2d
> 122, 124 (2d Cir. 1981) (rejecting argument that the
> ALJ must explicitly reconcile every shred of conflict-
> ing testimony).

Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012) (summary

order) (alterations in original); see also Greene v. Colvin, 936

F. Supp. 2d 216, 226 (W.D.N.Y. 2013) ("Although the hearing

officer is required to fully develop the record, [he] is not

required to discuss all the evidence submitted, and [his] failure

to cite specific evidence does not indicate that it was not

considered.").

       As an initial matter, it is not at all clear that

plaintiff's multiple conditions are indeed separate conditions;

rather, many of these conditions appeared to be different poten-

tial sources of plaintiff's back problems.  As discussed above,

the ALJ analyzed plaintiff's medical records and the objective

and subjective evidence regarding his "spinal cord disease"

extensively.  The only conditions noted by plaintiff in his

submission to this Court that the ALJ did not cite by name are

the epidermoid, cauda equina syndrome and thoracic/lumbar

radiculitis.[30]  Although the ALJ did not explicitly refer to each
of these conditions, the ALJ's conclusion that plaintiff's
alleged disabling limitations were not supported by the objective
evidence and that he was sufficiently managing his back pain with
medication demonstrates that the ALJ considered the combined
effects of the various potential sources (or combination of
sources) of plaintiff's chronic back pain.  <u>Mulero v. Colvin</u>, 12
Civ. 7348 (ALC), 2014 WL 4081011 at *5 (S.D.N.Y. Aug. 18, 2014)
(Carter, D.J.) (where "ALJ explicitly evaluated Plaintiff's
complaints of back pain and found that, despite her complaints,
Plaintiff sought very little treatment for the ailment" ALJ had
sufficiently considered the combined effects of those problems
supported by the record).

          Even if these were conditions that needed to be consid-
ered as different sources of plaintiff's pain, the ALJ appeared
to have considered all of them in his decision.  As to the
epidermoid (or cyst) claimed to be on plaintiff's spine, the ALJ
implicitly discussed this condition in connection with his
assessment of the MRI results.  The ALJ addressed the "neoplasm

---

[30] The ALJ expressly addressed the remaining conditions
plaintiff cites in his brief (Tr. 18 (referring to plaintiff's
"chronic radiating lower back pain"), 20 (referring to MRI report
notations of "mild concentric disc bulge" and "questionable"
bilateral L5 level spondylolys[i]s).

of glilial [sic] origin" noted on the MRI report (Tr. 18), which,
similar to the epidermoid, is defined as a growth such as a cyst
or tumor.  Dorland's at 631, 1239.  Indeed, Dr. Blank, who
plaintiff claims was his treating physician, did not mention the
epidermoid in her statement but rather stated that the MRI
created a concern for "intramedullary tumor/neoplasm" (Tr. 239-
4).  The neoplasm was specifically discussed by the ALJ (Tr. 18).
With respect to this condition, the ALJ noted that plaintiff "did
not submit any treatment notes from a neurosurgeon with regard to
the treatment of this possible 'neoplasm of glilial [sic] ori-
gin'" and, thus, stated that he "assume[d] that the claimant's
chronic radiating lower back pain owes instead to degenerative
narrowing at the L4-L5 level [of plaintiff's lumbar spine].  I do
not classify the neoplasm as a severe impairment" (Tr. 18).  Like
the neoplasm, there was no follow up from a neurosurgeon regard-
ing plaintiff's epidermoid or any other spinal growth, tumor, or
cyst on plaintiff's spine.[31]

        With respect to the cauda equina syndrome, the ALJ did
not discuss this issue apparently because there was no support in

---

        [31] Indeed, the MRI report appears to refer to the epidermoid
and neoplasm interchangeably (See Tr. 220 (stating that
"intramedullary lesion [] displays characteristics that most
likely correspond with an epidermoid" and that "findings are
concerning for an intramedullary neoplasm of glial origin")).

the medical records that plaintiff suffered from this condition. Although it was noted as an "additional diagnosis" during plaintiff's January 2011 emergency room visit (Tr. 224), the subsequent medical records indicate that plaintiff's physicians ruled that initial diagnosis out.  The MRI taken of plaintiff's lumbar spine shortly after the January 2011 emergency room visit did not reveal cauda equina syndrome and after that date plaintiff's physicians only cited cauda equina syndrome when summarizing the January 2011 emergency room visit notes; it was no longer listed as a diagnosis (Tr. 219-20, 244, 246, 248, 252, 261, 263, 265). The ALJ was not required to point out specifically the lack of supporting evidence for this condition when assessing plaintiff's allegedly disabling spinal cord disease.  See Campbell v. Astrue, supra, 465 F. App'x at 6; Dumas v. Schweiker, supra, 712 F.2d at 1553; Greene v. Colvin, supra, 936 F. Supp. 2d at 226.

Finally, thoracic/lumbar radiculitis refers to inflammation of the thoracic spinal nerves, Dorland's at 1571, 2051, and plaintiff's doctors at Beth Israel often cited this condition as a potential source of his complaints of back pain (Tr. 243, 252, 261, 265).  As discussed above, the ALJ analyzed the Beth Israel medical records extensively and noted that the Beth Israel staff reported that plaintiff was managing his back pain with medication (Tr. 21-23).

Therefore, although they were not each stated by name, the record reflects that the ALJ considered the combined effects of all of plaintiff's alleged conditions in determining that plaintiff was not disabled.  The ALJ's determination was supported with substantial evidence.

IV.  Conclusion

Accordingly, I conclude that the ALJ properly applied the applicable legal principles and that his determination that plaintiff was not disabled under the Act is supported by substantial evidence in the record.  For all the foregoing reasons, I respectfully recommend that the Commissioner's motion be granted and plaintiff's cross-motion be denied.

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Ronnie Abrams, United States District Judge, 40 Foley Square, Room 2203, and to the Chambers of the undersigned, 500 Pearl

Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Abrams. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:   New York, New York
         January 8, 2016

                                  Respectfully submitted,


                                  _____
                                  HENRY PITMAN
                                  United States Magistrate Judge

Copies transmitted to:

Michael S. Aranoff, Esq.
Suite 804
305 Broadway
New York, New York 10007

John Gura, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York   10007